668 S.E.2d 203

## In re FLOOD LITIGATION COAL RIVER WATERSHED.

**In re Flood Litigation Upper Guyandotte River Watershed Subwatershed 2a.**

**In re Flood Litigation Upper Guyandotte River Watershed Subwatershed 2a.**

**Nos. 33664, 33710 and 33711.**

Supreme Court of Appeals of West Virginia.

Submitted April 16, 2008.

Decided June 26, 2008.

See also, *In re Flood Litigation,* 216 W.Va. 534, 607 S.E.2d 863.

Scott S. Segal, Esq., Deborah L. McHenry, Esq., Samuel A. Hrko, Esq., The Segal Law Firm. W. Stuart Calwell, Jr., Esq., The Calwell Practice, J. David Cecil, Esq., James F. Humphreys & Associates, Charleston, WV, W. Randolph McGraw, Esq., Prosperity, WV, for Plaintiffs Below.

A.L. Emch, Esq., Jill M. Obenchain, Esq., Amber Lynn Hoback, Esq., Jackson Kelly, PLLC, Charleston, WV, for Defendants Below.

A.L. Emch, Esq., Jackson Kelly, PLLC, Charleston, WV, Amicus Curiae for Alex Energy, et al.

Richard J. Bolen, Esq., Cindy D. McCarty, Esq., Jonathan E. Porter, Esq., Huddleston, Bolen, Beatty, Porter & Copen, Huntington, WV, David E. Goddard, Esq., John Greg Goodykoontz, Esq., Steptoe & Johnson, Clarksburg, WV, for Western Pocahontas Properties.

PER CURIAM:

These two appeals from "flood litigation" cases have been consolidated for argument and decision. In one case we hold that a jury's determination was valid. In the other case, we hold that the lower court's dismissal of the case for failure to state a claim was erroneous.

## I.

Both of the instant appeals involve claims for injuries and damages resulting from flooding that occurred on July 8, 2001, in southern West Virginia—flooding that the plaintiffs allege was caused or exacerbated by timbering and/or mining operations that disturbed the watersheds lying upstream from the plaintiffs. Several thousand such claims were consolidated and assigned to the Mass Litigation Panel ("the Panel") established by this Court pursuant to Trial Court Rule 26.01. This Court previously addressed a number of certified questions that were posed by the Panel about these claims in *In re Flood Litigation*, 216 W.Va. 534, 607 S.E.2d 863 (2004).[1]

## II.

## A.

### The Slab Fork Case

One of the two appeals involves a jury trial that was conducted by a Mass Litigation Panel judge in March, April, and May of 2006, involving a number of defendants' mining and timbering operations in the Slab Fork and Oceana sub-watersheds of the Up-

per Guyandotte River (the "Slab Fork case"). In the Slab Fork case, the Panel judge adopted a Trial Plan in which a jury in a "Phase I" trial was asked to answer the following "common issues" questions as to each defendant:

1. Whether, as to each Defendant's individual operation or operations, the Defendant's use of its property materially increased the peak rate of surface water runoff leaving that operation as a result of the storm events on or about July 8, 2001, compared to the rate of peak surface water runoff that would have left the operation but for the Defendant's use of that property, and if so;

2. Whether the water from the individual Defendant's operations materially caused or contributed to, the stream or streams into which they discharged to overflow their banks, and;

3. Regardless of the findings made in 1 and 2 above, whether the Defendant's use of the property in question was unreasonable under the circumstances set forth by the Supreme Court of Appeals in the case

1. Following are the certified questions answered in *In re Flood Litigation*, and this Court's answers:

   1. Whether adjacent and non-adjacent plaintiffs have a cognizable cause of action based on allegations of unreasonable use of land under the balancing test set forth in *Morris Associates, Inc. v. Priddy*, 181 W.Va. 588, 383 S.E.2d 770 (1989). Answer: Yes.
   2. Whether the plaintiffs have a cognizable cause of action upon the allegation that the defendants were negligent in the use of their land and therefore answerable under the classic theory of negligence. Answer: Yes.
   3. Whether the plaintiffs have a cognizable cause of action upon the allegation that the operation of extracting and removing natural resources is an abnormally dangerous activity or that such activity produces ancillary conditions that create an unreasonably high risk of flash flooding so that the defendants are strictly liable to the plaintiffs for any damages caused by these activities. Answer: No.
   4. Do those plaintiffs herein who are riparian owners, by virtue of the fact that they own property adjacent to a stream or through which a stream flows, have a cognizable cause of action for interference with riparian rights based on the fact that the stream's natural flow was increased by a flood or the water of the

   stream overflowed and stood upon the riparian owner's land? Answer: Yes.
   5. In the event that a landowner conducts the extraction and removal of natural resources on its property in conformity with federal law and with permits issued by appropriate federal agencies, is any state court action preempted for damages caused by surface waters accumulating and migrating on residential property? Answer: No.
   6. Is compliance of a landowner in the extraction and removal of natural resources on his or her property with the appropriate state and federal regulations evidence in any cause of action against the landowner for negligence or unreasonable use of the landowner's land if the injury complained of was the sort the regulations were intended to prevent? Answer: Yes.
   7. Where a rainfall event of an unusual and unforeseeable nature combines with a defendant's actionable conduct to cause flood damage, and where it is shown that a discrete portion of the damage complained of was unforeseeable and solely the result of such event and in no way fairly attributable to the defendant's conduct, then is the defendant liable only for the damages that are fairly attributable to the defendant's conduct? Answer: Yes. 216 W.Va. at 550–551, 607 S.E.2d at 879–880.

of *In re Flood Litigation,* 216 W.Va. 534, 607 S.E.2d 863 (2004).

Under the Trial Plan, the jury's answer to the three questions in the Phase I trial would determine whether a particular defendant could be held liable to a particular plaintiff in subsequent proceedings. Phase I of the Trial Plan excluded evidence from individual plaintiffs and other lay evidence about the flooding—limiting both sides primarily to "expert" witnesses.

Prior to and during the Phase I trial, claims against a number of defendants were voluntarily dismissed by the plaintiffs (some due to settlements), leaving the jury at the end of the Phase I trial to answer the three questions only as they applied to two related defendant companies—the appellees Western Pocahontas Properties LLP and Western Pocahontas Corporation (together, "Western Pocahontas"), whose properties were located only in the Slab Fork watershed—and had only been timbered, not mined.

The jury in the Phase I trial answered each of the three questions "Yes," finding that Western Pocahontas had materially increased the peak flow of surface water from its property, that this increase in peak flow materially caused or contributed to causing the streams in the watershed to overflow their banks, and that Western Pocahontas' use of its land was not reasonable. Western Pocahontas sought relief from the jury's verdict by way of a Motion for Judgment as a Matter of Law or For a New Trial.

On March 15, 2007, the Panel judge entered an order striking the testimony of appellants' expert witnesses (and a report that they relied upon) and granting Western Pocahontas's Motion for Judgment as a Matter of Law, The Panel judge also awarded a conditional grant of Western Pocahontas'

Motion For a New Trial under Rule 59 of the *West Virginia Rules of Civil Procedure* on six grounds, and ruled that if this Court should reverse the order as to the granting of Western Pocahontas' Motion for Judgment as a Matter of Law, then Western Pocahontas nevertheless is entitled to a new trial on all issues.[2]

Before this Court, the plaintiffs in the Slab Fork case appeal the Panel judge's March 15, 2007 order. The appellants seek to have the order reversed and vacated in its entirety and seek reinstatement of the jury verdict. Western Pocahontas has cross-appealed in the Slab Fork case, raising issues that we discuss *infra.*

### B.

### The Coal River Case

The second appeal before this Court arises from claims based on flooding in the Coal River watershed (the "Coal River case"). In that case, a different Panel judge did not permit the case to go to trial. Unlike the judge in the Slab Fork case, the judge in the Coal River case refused to allow the plaintiffs to take discovery from the defendants. Instead, the judge granted the defendants' motion to dismiss, stating that:

> [the] Plaintiffs' complaints and amended complaints do not state what actionable conduct it is that any particular Defendant is alleged to have engaged in to cause of exacerbate any particular Plaintiff's alleged injuries .... [t]he complaints and amended complaints did not specify which plaintiffs were suing which defendants, which defendants' operations were at issue, or what was alleged to be improper with regard to any specific defendant operation

---

**2.** In conditionally granting a new trial, the Panel judge first found that the appellants' experts were not qualified to testify under Rule 702 of the *West Virginia Rules of Evidence.* Second, the judge found that the jury was "very likely overwhelmed by devastatingly prejudiced evidence" which was rendered irrelevant by the settlements and dismissals of other defendants. Third, the judge's exclusion of proffered evidence of flooding of the Twin Falls State Park golf course, when viewed in conjunction with the Panel judge's other "management errors" had a "cumulative effect" that "expanded exponentially" to significantly deny Western Pocahontas a fair trial. Fourth, the judge found that references to deaths resulting from the flood when tied with the "other errors" denied Western Pocahontas a fair trial and encouraged the jury to resort to passion and sympathy. Fifth, the judge found that he erroneously admitted what is known as the "FATT report" into evidence, see discussion *infra.* Sixth, the judge found that the verdict was against the clear weight of the evidence.

.... [w]here strict liability does not apply, there must be an allegation of some liability-producing act or omission related to the harm alleged on the part of each party against which recovery is sought. General allegations that all defendants engaged in the normal activities associated with the conduct of their lawful businesses without any specific information as to each defendant to indicate that such activities were conducted improperly or unreasonably are insufficient.

Following is an example of the plaintiffs' allegations against one of the defendants in the Coal River case—allegations that the Panel judge concluded did not state a claim upon which relief could be granted:

a. Defendant failed to monitor, audit, and inspect timbering activities conducted on its land for compliance with BMPs (Best Management Practices industry standards);

b. Defendant failed to compare BMP compliance of timbering activities conducted on its land with state BMP surveys and failed to set benchmarks for future performance and improvement;

c. Defendant failed to implement riparian protection measures, such as marking or flagging streamside management zones (SMZs) in advance of timber harvests on its land;

d. Defendant failed to develop a program or plan for protection of streams from timbering; and

e. Defendant's timbering activities disturbed an unreasonable percentage of drainage area corresponding to one or more of the twenty-one client clusters set out in plaintiffs' April 7, 2006 Unified Disclosures.

f. Surface mining operations on defendant's land violated, and were found to be in violation of, West Virginia mining regulations intended to reduce surface water runoff and/or minimize downstream sediment deposition on July 8, 2001;

g. Defendant failed to conduct a surface water runoff analysis before, during, and/or after conducting its surface mining activities;

h. Defendant failed to develop a plan to control surface water runoff from mining operations;

j. Defendant failed to develop a plan to minimize downstream sediment deposition from mining operations;.

k. Defendant engaged in surface mining activities and the construction of valley fills in an area that was unreasonably close to a local population center and where it was found to do harm; and

l. Defendant failed to reclaim its valley fills during construction by using a more appropriate valley fill construction method such as the "bottom-up" method, and instead used the less stable and more erosion-prone "end-dump" method.

m. Upon information and belief, the conduct of defendant was unreasonable in light of all the factors to be considered under the rule of reasonable use.

n. The conduct of the defendant was the proximate cause of, and/or materially contributed to, the flooding that occurred on July 8, 2001, on the property of those plaintiffs identified as claiming against the defendant.

o. The conduct of the defendant unreasonably increased the risk of flooding of the property of plaintiffs.

p. The defendant unreasonably interfered with the use and enjoyment of plaintiffs' property by increasing the risk of flooding.

The plaintiffs in the Coal River case ask that the Panel judge's order of dismissal be reversed and that their case be reinstated.

## II.

### A.

▮▮▮▮ In the Slab Fork case, three major pieces of plaintiffs' evidence supported the Slab Fork jury's answers to the Phase I questions. The trial court struck all three pieces of evidence, leaving little or no direct plaintiffs' evidence that could support the jury's answers.[3]

---

3. There was, however, significant evidence adduced on cross-examination from defense witnesses by the plaintiffs that arguably supported

"[W]hen a circuit court excludes expert testimony as unreliable under the [Rule 702] *Daubert/Wilt* gatekeeper analysis, we will review the circuit court's method of conducting the analysis de novo." *San Francisco v. Wendy's Intern., Inc.*, 221 W.Va. 734, 741, 656 S.E.2d 485, 492 (2007). "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syllabus Point 4, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

The first piece of evidence that the Panel judge struck was the report of the Flood Analysis Technical Team ("the FATT Report"), issued by a working group of West Virginia agency experts appointed by the Governor of West Virginia to review the 2001 flooding. The report used internationally-recognized computerized engineering models to assess the effects of land disturbance from mining and logging on flooding. The FATT report generally concluded that land disturbance from timbering and mining had increased flooding in southern West Virginia during the 2001 flood event, although the report did not look specifically at the watersheds in question in the instant appeals.

The second piece of evidence that the Panel judge struck was the testimony of Dr. Bruce A. Bell, an environmental engineer with distinguished credentials who designs and analyzes stormwater management systems. Dr. Bell, using computer models that are used by engineers in analyzing the effects of land disturbance on stormwater in a wide range of situations (computer models that were used by the FATT team), and having reviewed research on timbering effects on water flows, testified that land disturbances from timbering in the Slab Fork watershed caused a significant increase in the peak flow volume of the streams on July 8, 2001.

The third piece of plaintiffs' evidence that the Panel judge struck was the testimony of John Morgan, a mining engineer with expertise in hydrology and cumulative hydrologic impacts who has designed and reviewed stormwater management plans for state and federal governments. Relying in part on the same kind of computer model that the FATT team and Dr. Bell relied upon, Mr. Morgan's testimony emphasized the role of the extensive network of 245 miles of timbering skid roads located on the steep hillsides of the Slab Fork watershed in intercepting and altering the normal subsurface flow of infiltrated rainwater that characterizes the undisturbed forest floor.[4] Like Dr. Bell, Mr.

the jury's answers. We do not address that issue.

4. The evidence in the Slab Fork case showed that during the ten years preceding the July 2001 flood event, Western Pocahontas harvested timber from about forty percent of the 22,650–acre watershed. The timbering was done by felling all trees over a certain diameter, removing the trees' limbs, and dragging the logs with power winches and cables to a skid road and then along the skid road with mechanized skidders to log landings where the logs were cut into lengths and loaded onto trucks. The companies' evidence was that the skid roads were laid out and constructed in accordance with timbering Best Management Practices standards. The plaintiffs' evidence was that not all of the skid roads were so constructed. The panel judge cited Western Pocahontas' compliance with BMP standards as grounds for discrediting the plaintiffs' expert testimony. There was substantial evidence from which the jury could conclude that BMP standards were not designed or promulgated in order to significantly affect or control the quantity of

stormwater leaving a timbering site, only the quality. In Syllabus Point 9 of *In re Flood Litigation, supra*, this Court held as follows:

> Compliance of a landowner in the extraction and removal of natural resources on his or her property with the appropriate state and federal regulations may be evidence in any cause of action against the landowner for negligence or unreasonable use of the landowner's land *if the injury complained of was the sort the regulations were intended to prevent.* Such compliance, however, does not give rise to a presumption that the landowner acted reasonably or without negligence or liability to others in his or her extractions and removal activities. 216 W.Va. at 538, 607 S.E.2d at 867 (emphasis added). There was substantial evidence put on by experts for the defendants that tended to weigh against the methodology and the conclusions of the FATT report and the plaintiffs' experts. The defendants were critical of the plaintiffs' experts' choice of input figures in the computer models the experts used to demonstrate the effect of land disturbance on peak flows. The defendants' experts did not offer

Morgan reviewed research on the effects of timbering on water flow. Mr. Morgan concluded that the Slab Fork watershed had a thirty to fifty percent increase in peak flow during the July 2001 event, caused by the defendants' land-disturbing activities, and that this increase caused or aggravated downstream flooding. Mr. Morgan also testified that Western Pocahontas' use of its property in the Slab Fork watershed was not reasonable, because the large proportion of the Slab Fork watershed disturbed by timbering significantly contributed to downstream flooding, and because there was no evidence that Western Pocahontas at ·any time conducted a hydrological or stormwater/flood runoff evaluation of their property and the effects of their logging and road building.

This Court stated in *San Francisco v. Wendy's Intern., Inc.*, 221 W.Va. 734, 741, 656 S.E.2d 485, 492 (2007):

> "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix International, Inc.*, 128 F.3d 802, 806 (3rd Cir.1997). To assist the trier of fact, Rule 702 of the Rules of Evidence permits opinion testimony by an expert, and states:
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
>
> "Rule 702 reflects an attempt to liberalize the rules governing the admissibility of expert testimony." *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir.1999). *See also Gentry v. Mangum*, 195 W.Va. at 520, 466 S.E.2d at 179. ("In *Daubert/Wilt*, the *Frye* test was abandoned by the courts,

concluding that *Frye's* rigid standard was inconsistent with the liberal thrust of the Federal and West Virginia Rules of Evidence."); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (highlighting the " 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.' "). The rule "is one of admissibility rather than exclusion." *Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir.1991).

▌ In Syllabus Point 2 of *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), this Court, following the lead of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that:

> In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

In *Gentry v. Mangum*, 195 W.Va. 512, 525–27, 466 S.E.2d 171, 184–86 (1995), this Court stated:

> Because of the "liberal thrust" of the rules pertaining to experts, circuit courts should err on the side of admissibility.

competing calculations or models to support their position that the defendants' land disturbance did not increase peak flows. The experts for the defendants generally testified that timbering according to BMP standards cannot cause significant increases in downstream peak flows; and that therefore a company following

those standards, regardless of the extent of its operations in any given watershed, need not be concerned about causing any increased risk of downstream flooding. BMP standards apparently do not address the percentage of a watershed that may be safely timbered without having an effect on peak flows from a storm event.

*See* II Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 7-2(A) at 24 ("[t]his standard is very generous and follows the general framework of the federal rules which favors the admissibility of all relevant evidence")[.] ... "[d]isputes as to the strength of an expert's credentials, mere differences in the methodology, or lack of textual authority for the opinion go to weight and not to the admissibility of their testimony." *Gentry*, 195 W.Va. at 525–27, 466 S.E.2d at 184–86.

The defendants assert that the Panel judge properly applied the Rule 702 *Daubert/Wilt* analysis and struck the plaintiffs' evidence. The plaintiffs assert that their experts' evidence was not "scientific" evidence under *Wilt*, but was rather technical engineering evidence, to which this Court has said that the *Daubert/Wilt* analysis does not apply:

> Unless an engineer's opinion is derived from the methods and procedures of science, his or her testimony is generally considered technical in nature, and not scientific. Therefore, a court considering the admissibility of such evidence should not apply the gatekeeper analysis set forth by this Court in *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), and *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

Syllabus Point 3, *Watson v. Inco Alloys Intern., Inc.*, 209 W.Va. 234, 545 S.E.2d 294, 296 (2001). The plaintiffs further argue that even if their expert evidence is considered under a *Daubert/Wilt* analysis, the evidence met that test as well.

■ The record discloses that the plaintiffs' testifying experts (and the authors of the FATT report) had extensive training, education, and professional experience and expertise on how land disturbance affects the flow of surface water, and when one has to recognize and address those effects so as not to cause off-site impact to one's neighbors. The circuit court allowed substantial *voir dire* of the plaintiffs' experts by the defendants before qualifying the experts to testify to the jury, which *voir dire* firmly established their professional credentials and substantial experience. This was not a case of a befuddled jury confounded by bizarre, absurd, or irrational pseudoscientific assertions. *See Wilt*, 191 W.Va. at 45, 443 S.E.2d at 202.[5]

The computer models on which the plaintiffs' experts relied in part are a standard methodology used in the engineering profession to understand and assess peak stormwater flows from disturbed land and to design systems to control such flows. The same basic methodology was used by the FATT task force. The plaintiffs' experts' use of computer models is an accepted methodology for assessing and evaluating land disturbance effects on water within the engineering profession. The models' precision and utility in assessing the sensitivity of the Slab Fork watershed to land disturbance from Western Pocahontas' timbering was challenged in extensive cross-examination and by expert testimony, but these challenges went to the weight of the evidence, not its admissibility.

The fact that the plaintiffs' experts did not have substantial prior personal experience in assessing the effect of land disturbance from large-scale timbering operations—as opposed to surface mining, highway construction, and other land-disturbing operations—also went to the weight of their evidence; but their lack of such experience did not render that evidence inadmissible.

■ We need not decide whether the plaintiffs' expert testimony was properly sub-

5. The assessment of whether scientifically-based expert testimony is "reliable," as that term is used in *Daubert/Wilt*, does not mean an assessment of whether the testimony is persuasive, convincing, or well-founded. Rather, assessing "reliability" is a shorthand term of art for assessing whether the testimony is to a reasonable degree based on the use of knowledge and procedures that have been arrived at using the methods of science—rather than being based on irrational and intuitive feelings, guesses, or speculation. If the former is the case, then the jury may (or *may* not, in its sole discretion) "rely upon" the testimony. To be clear: this Court's jurisprudence (and the uniform practice in our trial courts) permits two reasonably well-qualified experts, each using a methodology that is grounded in something more than rank speculation or imagination (like reading tea leaves, detecting auras, and the like), to reach directly opposing conclusions—and both of the experts' testimonies will nevertheless fully meet the "reliability" threshold for admissibility set forth in *Daubert/Wilt*.

ject to a *Daubert/Wilt* "scientific" evidence analysis, because assuming *arguendo* that such an analysis was appropriate, the testimony was "reliable" in the sense that the jury—if they credited the testimony—could base their decision upon it. The testimony clearly met the liberal admissibility requirements of Rule 702. The jury was entitled to resolve the conflicts in the evidence and to believe the plaintiffs' experts and disbelieve the defendants' experts. The jury apparently did just that. Thus the weight of the evidence was not strongly against the plaintiffs, and an award of a new trial on that basis was erroneous.

■■■ We conclude that the Panel judge erred in striking, post-trial, the plaintiffs' expert evidence, and in granting judgment for the defendants; and in finding that defects in the plaintiffs' experts' evidence warranted the conditional grant of a new trial.[6]

The defendants have cross-appealed in the Slab Fork case, arguing that the inclusion in the Phase I trial of a jury determination of reasonableness was erroneous, and that the evidence permitted on reasonableness was incomplete and inadequate.

This Court held in Syllabus Point 2 of *Morris Associates, Inc. v. Priddy*, 181 W.Va. 588, 383 S.E.2d 770 (1989):

Generally, under the rule of reasonable use, the landowner, in dealing with surface water, is entitled to take only such steps as are reasonable, in light of all the circumstances of relative advantage to the actor and disadvantage to the adjoining landowners, as well as social utility. Ordinarily, the determination of such reasonableness is regarded as involving factual issues to be determined by the trier of fact. To the extent that *Jordan v. City of Benwood*, 42 W.Va. 312, 26 S.E. 266 (1896), differs, it is overruled.

In *Pendergrast v. Aiken*, 293 N.C. 201, 236 S.E.2d 787 (1977), a leading case cited by this Court in *Morris v. Priddy, supra*, the court said:

Regardless of the category into which the defendant's actions fall, the reasonable use rule explicitly, as in the case of intentional acts, or implicitly, as in the case of negligent acts, requires a finding that the conduct of the defendant was unreasonable. This is the essential inquiry in any nuisance action Reasonableness is a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant. Determination of the gravity of the harm involves consideration of the extent and character of the harm to the plaintiff, the social value which the law attaches to the type of use which is invaded, the suitability of the locality for that use, the burden on plaintiff to minimize the harm, and other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of the purpose of the defendant's conduct, the social value

---

**6.** We conclude that the Panel judge's other reasons for the conditional grant of a new trial do not support that result. A full review of the lengthy trial transcript does not support the conclusion that the jury could not set aside evidence about other defendants who had been dismissed during the trial. It was clear from the testimony, exhibits, instructions, and argument to the jury that there were two defendants in one watershed remaining—and that the case as submitted to the jury involved only timber management and harvesting in that watersheds. The jury could easily understand this and probably welcomed the simplification. It would make multi-plaintiff and multi-defendant litigation practically infeasible to conclude that partial settlements during trial authorize a judge to "start all over" because jurors cannot be trusted to clear their "mental databases." For better or for worse, courts in many instances rely on juries to do just that—and there is no evidence that the jury did not do its job in

the Slab Fork case. The Panel judge also cited the exclusion of photographs purporting to show flooding of the Twin Falls State Park golf course—which is outside the Slab Fork watershed. Our review of the record leads to the firm conclusion that any error with respect to the photographs was *de minimis*. Nor was the brief mention of the fact that people had died in the July 2001 flooding in question grounds for a new trial; in fact, the Phase I trial was notably lacking in appeals to emotion or sympathy. The Panel judge also found that the plaintiffs' experts relied on a forestry expert for the plaintiff who did not testify, and that this reliance made the plaintiffs' experts' testimony inadmissible. Our review of the record does not show any reliance that would justify such a conclusion. We have considered the defendants' other arguments made in their cross-appeal and in support of the trial court's rulings, and likewise find them to be without merit.

which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence.... We emphasize that, even should alteration of the water flow by the defendant be "reasonable" in the sense that the social utility arising from the alteration outweighs the harm to the plaintiff, defendant may nevertheless be liable for damages for a private nuisance "if the resulting interference with another's use and enjoyment of land is greater than it is reasonable to require the other to bear under the circumstances without compensation." The gravity of the harm may be found to be so significant that it requires compensation regardless of the utility of the conduct of the defendant.... "(W)hile today's mass home building projects ... are assuredly in the social good, no reason suggests itself why, injustice, the economic costs incident to the expulsion of surface waters in the transformation of the rural or semi-rural areas of our State into urban or suburban communities should be borne in every case by adjoining landowners rather than by those who engage in such projects for profit. Social progress and the common wellbeing are in actuality better served by a just and right balancing of the competing interests according to the general principles of fairness and common sense which attend the application of the rule of reason."

293 N.C. at 217–218, 236 S.E.2d at 797 (1977) (internal citations omitted).[7]

7. *See also Wilkinson v. Charles Inv. Co.*, 48 N.C.App. 213, 215–16, 268 S.E.2d 263, 264–65 (1980):

Each possessor is legally privileged to make a reasonable use of his land, even though the flow of surface water is altered thereby and causes some harm to others, but liability is incurred when his harmful interference with the flow of surface waters is unreasonable and causes substantial damage. ... Reasonableness is a question of fact to be determined in each case by weighing the gravity of the harm to the plaintiff against the utility of the conduct of the defendant Determination of the gravity of the harm involves consideration of the extent and character of the harm to the plaintiff, the social value which the law attaches to the type of use which is invaded, the suitability of the locality for that use, the burden on plaintiff to minimize the harm, and other relevant considerations arising upon the evidence. Determination of the utility of the conduct of the defendant involves consideration of the purpose of the defendant's conduct, the social value which the law attaches to that purpose, the suitability of the locality for the use defendant makes of the property, and other relevant considerations arising upon the evidence.... We emphasize that, even should alteration of the water flow by the defendant be "reasonable" in the sense that the social utility arising from the alteration outweighs the harm to the plaintiff, defendant may nevertheless be liable for damages for a private nuisance "if the resulting interference with another's use and enjoyment of land is greater than it is reasonable to require the other to bear under the circumstances without compensation." (citations omitted).

*See also Ferguson v. City of Keene*, 111 N.H. 222, 224 225, 279 A.2d 605, 607–08 (1971) (citations omitted):

Defendant in this case was liable if the harm imposed upon the plaintiff was "greater than it is reasonable to require (her) to bear under the circumstances, without compensation." The circumstances include balancing the utility of the use against the gravity of the harm suffered by the plaintiff and if it meets the above test plaintiff is entitled to damages even though she could not obtain an injunction. (citations omitted).

*See also Walsh v. Town of Stonington Water Pollution Control Authority*, 250 Conn. 443, 456–57, 736 A.2d 811, 819 (1999):

The charge to the jury in the present case was consistent with our prior holdings on the element of unreasonable use. When viewed in the context of the charge as a whole, the jury instructions concerning unreasonable use conveyed to the jury that it was to take into consideration and weigh the conflicting interests involved. The trial court stated at the outset of the explanation of the unreasonable use element of the claim that the jury *"must consider the location of the condition and any other circumstances that you find proven which indicate whether the defendants [were] making a reasonable use of the property."* (Emphasis added.) This statement indicates that the jury must take into account a multiplicity of factors. Reference to the fact that the use of the property for a plant is a reasonable use makes clear that the use of the defendants' land to operate a plant is reasonable *in and of itself.* By then noting that the determination of reasonableness is to be made in the context of odors produced by the plant, the trial court underscored that the weighing process for the jury to conduct is of the reasonableness of use *in light of the production of unreasonable odors* that the jury had determined existed in its answers to the first four interrogatories. We disagree with the defendants, therefore, that the effect of the jury instruction was to remove the interests of the defendants from the jury's consider-

Taking into account the wide range of "reasonableness" factors that must be considered in determining a defendant's ultimate liability *vel non* to a plaintiff under the *Morris v. Priddy* "reasonable use" doctrine and related causes of action asserted by the plaintiffs, it is true that the Phase I Slab Fork trial did not permit a complete range of evidence on the reasonableness issue to be presented to the jury. For example, there was no significant evidence about specific harm to any plaintiffs or their interests; and likewise the "social utility" of the defendants' conduct was not fully developed at the Phase I proceeding. However, the Phase I trial did present to the jury the basic fact of injurious flooding downstream from the defendants' operations; and there was very substantial evidence presented by the defendants on the reasonableness of their approach to conducting their operations and exercising responsibility to their downstream neighbors.[8]

■ The trial of "mass claim" cases may necessitate novel and creative trial proce-dures. "A creative, innovative trial management plan developed by a trial court which is designed to achieve an orderly, reasonably swift and efficient disposition of mass liability cases will be approved so long as the plan does not trespass upon the procedural due process rights of the parties." Syllabus Point 3, *State ex rel. Appalachian Power Co. v. MacQueen*, 198 W.Va. 1, 479 S.E.2d 300 (1996).

The first two Slab Fork Phase I trial questions asked the jury to make findings that would, if the jury's answer for a given defendant was "no," eliminate from the case those defendants whose conduct simply had not contributed to flooding. This was an eminently practical and fair goal. The third Phase I jury question allowed the jury to make a threshold finding that a defendant's contribution to the flooding was not unreasonable. Notably, a defendant's liability for damages to any plaintiff was not determined in Phase I. There is no basis for speculating

ation. Rather, we conclude that the trial court's charge provided a reasonably clear instruction that the jury must consider many factors in determining the reasonableness of use, including the reasonableness of use as a plant that creates certain odors in the course of its operation. [emphasis in original].
See also *Rainey v. St. Lawrence Homes, Inc.*, 174 N.C.App. 611, 614, 621 S.E.2d 217, 220 (2005); *Graber v. City of Peoria*, 156 Ariz. 553, 753 P.2d 1209, 1211 (1988). *Board of Transp. v. Terminal Warehouse Corp.*, 44 N.C.App. 81, 91, 260 S.E.2d 696, 702 (1979); *Blue Ridge Poultry & Egg Co. v. Clark*, 211 Va. 139, 144, 176 S.E.2d 323, 327 (1970):
The doctrine of "balancing of equities" must be viewed in light of our long standing pronouncement that a private landowner is to be protected for injuries he may sustain "even though inflicted by forces which constitute factors in our material development and growth." (citations omitted).
See also *Taylor v. Culloden Public Service Dist.*, 214 W.Va. 639, 649, 591 S.E.2d 197, 207 (2003):
We take a dim view of WVAWC's suggestion that a reversal of the lower court's ruling will effectively halt other companies from ever agreeing to assume operation of utilities which are experiencing difficulties. We similarly find offensive the suggestion that the social value of providing a wastewater treatment plant so outweighs the gravity of the harm experienced by the Balls that there can be no recovery under nuisance law on the facts of this case. *See generally*, *Hendricks v. Stalnaker*, 181 W.Va. 31, 34–35, 380 S.E.2d 198, 201–02 (1989) (discuss-

ing use of balancing test for determining whether interference with landowner's private use and enjoyment of property is unreasonable and, therefore, a nuisance). Operating a business or providing a service that has societal benefits does not give a corporate entity license to freely pollute the waters of this State or to negatively affect the use and enjoyment of privately owned property.
See also *Hughes v. Emerald Mines Corp.*, 303 Pa.Super. 426, 438, 450 A.2d 1, 7 (1982):
No one is contending that the mining of coal is not a useful activity, and airshafts are a necessary part of that activity as safeguards to the health of miners. "Unreasonable", however, is a term of art, a legal definition rather than a moral judgment on the good sense of a party. Utility of an act must be balanced against the bad effects resulting from that act in determining its reasonableness. The harm to plaintiffs in the loss of both their wells was undeniably "severe," and we are inclined to agree with the finder of fact that the loss is "greater than they should be required to bear without compensation," *"regardless of the utility of the conduct."* (Citations omitted).

8. *See generally* Lewin, Jeff L., "The Silent Revolution in West Virginia's Law of Nuisance," 92 W.Va.L.Rev. 235 (Winter 1989–90) for a discussion of how, in the context of nuisance law and related causes of action and doctrines, determining "reasonableness" requires looking at the interests and conduct of both the plaintiff and the defendant.

that appropriate additional evidence on reasonableness that was not developed in the Phase I proceeding will be precluded in further proceedings. If anything, the permissible scope of the evidence on reasonableness in the Phase 1 proceeding was skewed in favor of the defendants. While the "reasonableness" aspect of the Phase I trial may not have been perfect, it was not fundamentally unfair to the defendants, and the trial advanced the cases toward resolution.

■ We conclude that the Phase I trial was conducted in keeping with the approach approved in *State ex rel. Appalachian Power Co. v. MacQueen,* and did not trespass upon the procedural due process rights of the defendants. The defendants' cross-appeal on this issue is therefore not meritorious.

Based on the foregoing reasoning, we reverse the Panel judge's March 15, 2007 grant of judgment for the defendants and conditional grant of a new trial, and remand the case to the Mass Litigation Panel with instructions to reinstate the verdict of the Phase I jury and to proceed to further proceedings based thereon.

## B.

■ The Coal River case involves claims and allegations that are very similar to those in the Slab Fork case. However, the Coal River case "never made it to trial"—or even to the taking of discovery by the plaintiffs (who were nevertheless required to provide information to the defendants in the form of "more definite statements" pursuant to Rule 12(e) of the *West Virginia Rules of Civil Procedure*). Rather, the Panel judge assigned to try the Coal River case concluded that the allegations in the plaintiffs' complaint (including amended complaints) did not allege conduct, facts, and circumstances that if proven would subject the defendants to liability. Therefore the judge granted the defendants' Rule 12(b)(6) Motion to Dismiss.[9]

■ "Appellate review of a circuit court's order granting a motion to dismiss a com-

plaint is *de novo.*" Syllabus Point 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995).

This Court stated in *Ewing v. Board of Educ. of County of Summers,* 202 W.Va. 228, 235, 503 S.E.2d 541, 548 (1998):

> Generally, a motion to dismiss should be granted only where " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Murphy v. Smallridge,* 196 W.Va. 35, 36, 468 S.E.2d 167, 168 (1996) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59, 65 (1984)) (additional citation omitted). For this reason, motions to dismiss are viewed with disfavor, and we counsel lower courts to rarely grant such motions. *John W. Lodge Distrib. Co., Inc. v. Texaco, Inc.,* 161 W.Va. 603, 605–06, 245 S.E.2d 157, 159 (1978). Once a court has granted a motion to dismiss, though, we employ a *de novo* standard of review. See, e.g., Syl. pt. 1, *Lipscomb v. Tucker County Comm'n,* 197 W.Va. 84, 475 S.E.2d 84 (1996) ("Appellate review of a circuit court's order granting a motion to dismiss an appeal from a decision of a county commission is de novo."); Syl. pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.,* 194 W.Va. 770, 461 S.E.2d 516 (1995) ("Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo.*").

■ As previously set forth, the complaint in the Coal River case alleges *inter alia* the following (a larger sample of these allegations is quoted at I. B. *supra):*

> e. Defendant's timbering activities disturbed . an unreasonable percentage of drainage area corresponding to one or more of the twenty-one client clusters set out in plaintiffs' April 7, 2006 Unified Disclosures.

> f. Surface mining operations on defendant's land violated, and were found to be in violation of, West Virginia mining regu-

---

**9.** The plaintiffs in the Coal River case also argue that it was wrong for their complaints to be dismissed after nearly six years of litigation, after review by this Court in *In re Flood Litigation,* *supra,* and after the plaintiffs' investment of literally millions of dollars in investigation. We agree that these factors strongly militate against the dismissal of the complaint.

lations intended to reduce surface water runoff and/or minimize downstream sediment deposition on July 8, 2001;

g. Defendant failed to conduct a surface water runoff analysis before, during, and/or after conducting its surface mining activities;

h. Defendant failed to develop a plan to control surface water runoff from mining operations;

n. The conduct of the defendant was the proximate cause of, and/or materially contributed to, the flooding that occurred on July 8, 2001, on the property of those plaintiffs identified as claiming against the defendant.

o. The conduct of the defendant unreasonably increased the risk of flooding of the property of plaintiffs.

p. The defendant unreasonably interfered with the use and enjoyment of plaintiffs' property by increasing the risk of flooding.

Our discussion of the issues and proof in the Slab Fork case at II. A. *supra* shows that the allegations of the plaintiffs in the Coal River case set forth with adequate specificity the same sort of facts, conduct, and circumstances that the Slab Fork plaintiffs were required to prove—essentially, that the defendants' land disturbance activities had unreasonably caused or contributed to flooding that injured the plaintiffs.[10] There is no merit to the defendants' argument and the Panel judge's conclusion that the plaintiffs' complaint does not give the Coal River defendants fair notice of the asserted factual and legal basis for the plaintiffs' claims.

Our discussion *supra* of the Slab Fork case further shows that such issues as causation,

reasonableness, due care, injury, etc. will certainly be the subject of evidentiary conflict. But the plaintiffs in the Coal River case have sufficiently stated claims upon which relief may be granted, and they are entitled to try to prove those claims to a trier of fact. Accordingly, the dismissal of the plaintiffs' complaint in the Coal River case is reversed and the case is remanded to the Mass Litigation Panel.

### III.

The Slab Fork and Coal River cases are remanded to the Mass Litigation Panel for further proceedings consistent with this opinion.

Reversed and Remanded.

Chief Justice MAYNARD, deeming himself disqualified, did not participate in the decision of this case.

Justice DAVIS, deeming herself disqualified, did not participate in the decision of this case.

Justice BENJAMIN, deeming himself disqualified, did not participate in the decision of this case.

Judge RUSSELL M. CLAWGES, JR., sitting by temporary assignment.

Judge DARRELL PRATT, sitting by temporary assignment.

JUDGE O.C. SPAULDING, sitting by temporary assignment.

---

10. The defendants cite to the recent United States Supreme Court case of *Bell Atlantic v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). That case involved a complaint that alleged "parallel business conduct" in support of charging an alleged illegal conspiracy to violate anti-trust laws. The Supreme Court held that merely alleging such parallel conduct without also alleging an actual agreement between the alleged conspirators did not state a cause of action, and set forth language suggesting that a complaint in federal court must now "plausibly suggest" that there are facts that would support the plaintiffs' claim. Although this Court has not considered whether such a standard should be adopted, the Coal River

plaintiffs' complaint clearly meets that standard. The Panel judge cited to *Harold's Auto Parts, Inc. v. Mangialardi*, 889 So.2d 493 (Miss.2004), where the court ruled that a generic "mass tort" complaint was not specific enough in a case where 264 plaintiffs were exposed over a seventy-five-year period of time to asbestos products associated with 137 manufacturers in approximately 600 workplaces. In the Coal River case, the plaintiffs are in one specific watershed, and they allege injuries suffered on one day as a result of the conduct of specific defendants' operations in that one watershed, and their complaint is far more specific than the one at issue in *Harold's Auto Parts*.