IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2015 Term

_____

No. 14-0968

_____

FILED

**November 18, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

RICHARD WAKEFIELD,
Defendant Below, Petitioner

_____

Appeal from the Circuit Court of Jefferson County
The Honorable David H. Sanders, Judge
Criminal Action No. 13-F-63

AFFIRMED

_____

Submitted: September 16, 2015
Filed: November 18, 2015

James T. Kratovil, Esq.                    Brandon H. Sims, Esq.
Kratovil Law Offices PLLC                  Assistant Prosecutor
Charles Town, West Virginia                Jefferson County Prosecutor's Office
Counsel for the Petitioner                 Charles Town, West Virginia
                                           Counsel for the Respondent

JUSTICE BENJAMIN delivered the Opinion of the Court.

JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

SYLLABUS BY THE COURT

1.      "The first and universal requirement for the admissibility of scientific evidence is that the evidence must be both 'reliable' and 'relevant.' Under *Daubert/Wilt*, the reliability requirement is met only by a finding by the trial court under Rule 104(a) that the *scientific* or technical theory which is the basis for the test results is indeed 'scientific, technical, or specialized knowledge.' The trial court's determination regarding whether the scientific evidence is properly the subject of 'scientific, technical, or other specialized knowledge' is a question of law that we review *de novo*. On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' W.Va.R.Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement are reviewed under an abuse of discretion standard." Syl. Pt. 3, *Gentry v. Mangum*, 195 W. Va. 512, 466 S.E.2d 171 (1995).

2.      "'[A] double jeopardy claim [is] reviewed *de novo*.' Syllabus Point 1, in part, *State v. Sears*, 196 W.Va. 71, 468 S.E.2d 324 (1996)." Syl. Pt. 1, *State v. McGilton*, 229 W.Va. 554, 729 S.E.2d 876 (2012).

3.      "In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant

i

to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify." Syl. Pt. 5, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

4.     "When scientific evidence is proffered, a circuit court in its 'gatekeeper' role under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand." Syl. Pt. 4, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

5.     "The question of admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994) only arises if it is first established that the testimony deals with 'scientific knowledge.' 'Scientific' implies a grounding in the methods and procedures of science while 'knowledge' connotes more than subjective belief or unsupported speculation. In order to qualify as 'scientific knowledge,' an inference or

assertion must be derived by the scientific method. It is the circuit court's responsibility initially to determine whether the expert's proposed testimony amounts to 'scientific knowledge' and, in doing so, to analyze not what the experts say, but what basis they have for saying it." Syl. Pt. 6, *Gentry v. Mangum*, 195 W.Va. 512, 466 S.E.2d 171 (1995).

6. "In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community." Syl. Pt. 2, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993).

7. "'The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the

evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under this test, we will reverse a trial court's ruling only if there has been a clear abuse of discretion.' Syllabus Point 6, *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999)." Syl. Pt. 8, *State v. Robert Scott R., Jr.*, 233 W.Va. 12, 754 S.E.2d 588 (2014).

8.     ""'Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.' Syl. pt. 8, *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983), quoting *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).' Syllabus point 1, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983)." Syl. Pt. 4, *State v. Sayre*, 183 W.Va. 376, 395 S.E. 2d 799 (1990).

9.     "'The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense.' Syl. pt. 1 of *Conner v. Griffith*, 160 W.Va. 680, 238 S.E.2d 529 (1977)." Syl. Pt. 1, *State v. Myers*, 171 W.Va. 277, 298 S.E.2d 813 (1982).

iv

10.     "'In ascertaining legislative intent, a court should look initially at the language of the involved statutes and if necessary, the legislative history to determine if the legislature has made a clear expression of its intention to aggregate sentences for related crimes. If no such clear legislative intent can be discerned, the test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L.Ed. 306 (1932), to determine whether each offense requires an element of proof the other does not. If there is an element of proof that is different, then the presumption is that the legislature intended to create separate offenses.' Syl. Pt. 8, *State v. Gill*, 187 W.Va. 136, 416 S.E.2d 253 (1992)." Syl. Pt. 2, *State ex rel. Games-Neely v. Silver*, 226 W.Va. 11, 697 S.E.2d 47 (2010).

Benjamin, Justice:

Petitioner Richard Wakefield, defendant below, appeals his convictions of two counts of sexual assault in the second degree and two counts of sexual assault in the third degree for which he was effectively sentenced to not less than ten nor more than twenty-five years in prison. Petitioner asserts four assignments of error alleging that the circuit court erred in the following respects: 1) in allowing the State to present an expert witness on the issue of GHB[1] intoxication because the science behind the expert's testimony does not meet the *Daubert* standard; 2) in not allowing the Petitioner to introduce evidence or question the State's witness, Billy Carper, on what activity if any took place immediately prior to P.L.[2] going into the house where she was allegedly assaulted; 3) in allowing the jury to consider both second degree sexual assault and third degree sexual assault based on the same act in violation of double jeopardy principles; and 4) in violating the Petitioner's confrontation clause rights by allowing the bailiff to have a conversation with a juror on February 12, 2014, about a potential witness. Having fully considered the parties' arguments, the record before us on appeal, and applicable legal precedent, we affirm the circuit court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

_____

[1] Gamma-Hydroxybutyrate is a central nervous system depressant.

[2] Consistent with Rule of Appellate Procedure 40(e), we use initials to protect the alleged victim's identity.

1

On February 18, 2014, at the conclusion of a three-day jury trial, the Petitioner was convicted of all four counts of Jefferson County Indictment 13-F-63, which charged him with two counts of sexual assault in the second degree and two counts of sexual assault in the third degree. Following a sentencing hearing on July 14, 2014, the circuit court, by order entered July 16, 2014, sentenced the Petitioner to an effective sentence of not less than ten nor more than twenty-five years in the penitentiary.[3] Thereafter, following a hearing on August 4, 2014, and by order entered August 6, 2014, pursuant to West Virginia Code § 62-12-26, the court further ordered that the Petitioner be subject to the mandatory minimum of two years of supervised release following his release from incarceration. It is from these convictions and sentences that the Petitioner now appeals.

The evidence adduced at trial was that on June 10, 2012, the Petitioner, the alleged victim, P.L., and a third person, Billy Carper, met at Glory Days restaurant in Ranson, Jefferson County, for an early dinner. After an evening spent together, the

---

[3] The Petitioner was sentenced to not less than ten nor more than twenty-five years for his two convictions for sexual assault in the second degree, which sentences were ordered to be served concurrently with one another. Further, the Petitioner was sentenced to not less than one nor more than five years for each of his two convictions for sexual assault in the third degree, which were ordered to be served consecutively to one another but concurrently to his sentences for sexual assault in the second degree. The sentences imposed thus constituted an effective term of not less than ten nor more than twenty-five years in the penitentiary.

Petitioner allegedly sexually assaulted P.L. inside Mr. Carper's house in the early morning hours of June 11, 2012.

At the time he allegedly committed the sexual assault of P.L., the Petitioner was a 56-year-old police officer with the Department of Homeland Security who worked with Mr. Carper at the Mount Weather facility in Loudoun and Clarke Counties in Virginia. The Petitioner and his wife resided in Titusville, Pennsylvania, but he commuted to Virginia several days each week residing at the barracks at Mount Weather. During the months preceding the sexual assault, the bunk rooms at Mount Weather were renovated, so when he was in the area for work, the Petitioner began to stay with his co-worker, Mr. Carper, who had a guest room. Thereafter, the Petitioner began to regularly stay at Mr. Carper's residence whenever he was in the area, including on weekends when he was not working. Mr. Carper, a native of the Jefferson County area, took the Petitioner to dinner and local bars in the area.

Mr. Carper introduced the Petitioner to P.L. on an evening prior to the night of the alleged sexual assault. The three planned to meet for an early dinner on June 10, 2012, at Glory Days. The men arrived first around 4:00 p.m., and ate and drank two beers while watching a NASCAR race on television. P.L., a 25-year-old co-worker at Mr. Carper's second job, joined the men later, sometime after 5:00 p.m. P.L. ate an appetizer and drank a beer.

3

After P.L. finished eating, the three drove in their separate cars to Mr. Carper's residence where the men showered and changed to go out for the evening. Approximately 45 minutes to an hour later, the three left Mr. Carper's residence in the Petitioner's vehicle. The three traveled to the Vista lounge where P.L. ate another appetizer and drank part of a beer. According to P.L., "we weren't there for very long, just long enough to eat." The three then went to the Turf in Charles Town, but decided not to stay because the jukebox was broken. From the Turf, the three went to Doc's bar, also in Charles Town, where they remained for several hours over the rest of the evening. P.L. drank several drinks while at Doc's, but testified that she did not finish all of them. During direct examination, P.L. testified:

> Q: Well, how did that happen that you didn't drink all of those?
>
> A: I got to the point where I felt like I didn't want to drink anymore. I started sipping on the last beer that I had, and it started to get really warm and I sat and sipped on that for probably a good hour.
>
> Q: Did you ultimately finish that beer that had gotten warm?
>
> A: No, ma'am.
>
> Q: Did you have anything else to drink after that?
>
> A: No, ma'am. Well, I started sipping on a cold beer that the [Petitioner] had brought me a cold beer and I told him I didn't want it but it was cold so I started sipping on that instead of the warm beer.

Q: Did you finish that beer Mr. Wakefield, the [Petitioner], brought you?

A: I do not remember finishing that beer, ma'am.

Mr. Carper testified that P.L. did not appear to be intoxicated close to the time they left Doc's. P.L. herself testified that she did not feel intoxicated that night, was not slurring her words, had no trouble with balance or walking, and was never slumped over the bar or table. The three left Doc's around 1:00 a.m. P.L. testified that she recalled the Petitioner asking her and Mr. Carper if they were ready to leave, that she grabbed her phone, keys and purse, "and I remember walking out the door, and that is the last thing I remember."

According to P.L., her next memory was when "[she] woke up and [the Petitioner] was attempting to have sex with [her]." P.L. testified that she could clearly see the Petitioner because there was a light on in another room which provided sufficient illumination that "[she] knew exactly who it was." She testified that the Petitioner performed oral sex on her, after which he engaged in vaginal intercourse. P.L. stated that throughout this period, she "tried very hard to make [herself] move and [she] couldn't." Nor could she speak or verbally communicate. She testified that she felt helpless and described her experience by stating, "[i]magine trying so hard to force yourself to move and you can't do it no matter what force to move, trying so hard to make yourself stop, to say stop, and you can't even make yourself say stop." P.L. further described her physical

5

symptoms during the Petitioner's sexual assault of her by stating, "[i]t was like being outside your body watching everything happen, but you can feel everything, you can feel every little touch, but at the same time not being able to do anything to make it stop." P.L. testified that at some point in the night while the Petitioner was present with her, she was "throwing up violently and uncontrollably not from nausea just violently, violently throwing up feeling like your stomach was being ripped out." However, she was unsure whether she was sick before or after the sexual assault.

P.L. testified that when she awoke in the morning, she was disoriented and wearing different clothing than she wore out the night before, including a pair of men's athletic shorts. She testified that she felt different than if she had a hangover. She stated, "[w]ell, normally when somebody is sick with alcohol, you're nauseous or have a headache, you know, when you're becoming intoxicated, you can feel that, I didn't have anything like that." She walked downstairs from the bedroom where she woke up and sought out Mr. Carper, with whom she stayed intermittently crying and sleeping for several hours. After several hours, she informed Mr. Carper that the Petitioner had sexually assaulted her during the night in the upstairs bedroom.

Mr. Carper testified that he and P.L. confronted the Petitioner about the sexual assault that morning. Initially Mr. Carper asked the Petitioner if "anything happened" upstairs during the night. The Petitioner responded, "not that I know of." Mr.

6

Carper testified that the Petitioner did not deny that he sexually assaulted P.L., but instead repeatedly stated he was sorry and that he did not remember what happened. Upon further questioning by Mr. Carper, the Petitioner gave a detailed description of being with P.L. in the guest room. Mr. Carper testified that the Petitioner told him he was with P.L. "up until the point that she got sick and he was rubbing her back, then it seemed, he blacked out, then he woke up and walked downstairs, so it looks like there was some sort of gap there that he was not recalling." Mr. Carper testified that he confronted the Petitioner a second time later on June 11, 2012, and during this second conversation the Petitioner said, "I don't know how this could have happened," and "I might as well eat my gun." Mr. Carper also testified that the Petitioner twice told him, "I don't know why you don't just take me out right now." Throughout this period, the Petitioner was shaking violently. At one point, the Petitioner also stated he needed to call his wife and tell her "what happened."

In the afternoon before leaving Mr. Carper's residence with his belongings, the Petitioner, at P.L.'s request, went out and purchased a morning after emergency contraceptive pill for her. P.L. testified that she hesitated to immediately report the sexual assault because the Petitioner was a police officer. Further, P.L. testified that she was concerned that reporting the sexual assault could affect her own employment. Nonetheless, P.L. did go to City Hospital and was examined by a forensic nurse examiner

approximately sixteen to twenty hours after the sexual assault occurred. The forensic nurse examiner found that P.L. exhibited bruising and vaginal tearing.

## II. STANDARD OF REVIEW

"The decision to admit or reject evidence is committed to the sound discretion of a trial court, and the court's determinations are reviewable only for an abuse of discretion." *State v. LaRock*, 196 W.Va. 294, 306, 470 S.E.2d 613, 625 (1996); *Board of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 612, 390 S.E.2d 796, 811 (1990); *Rozas v. Rozas*, 176 W.Va. 235, 240, 342 S.E.2d 201, 206 (1986). In *Gentry v. Mangum*, 195 W. Va. 512, 520 n. 6, 466 S.E.2d 171, 179 n. 6 (1995), we explained that

> [o]nly rarely and in extraordinary circumstances will we, from the vista of a cold appellate record, reverse a circuit court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect. Our review, however, must have some purpose and that is why we review under an abuse of discretion standard. In general, an abuse of discretion occurs when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed but the circuit court makes a serious mistake in weighing them.

In the area of scientific evidence, however, we have adopted a specifically tailored standard of review. In syllabus point three of *Gentry*, 195 W. Va. 512, 466 S.E.2d 171, we stated:

> The first and universal requirement for the admissibility of scientific evidence is that the evidence must be both 'reliable'

8

and 'relevant.' Under *Daubert/Wilt*, the reliability requirement is met only by a finding by the trial court under Rule 104(a) that the *scientific* or technical theory which is the basis for the test results is indeed 'scientific, technical, or specialized knowledge.' The trial court's determination regarding whether the scientific evidence is properly the subject of 'scientific, technical, or other specialized knowledge' is a question of law that we review *de novo*. On the other hand, the relevancy requirement compels the trial judge to determine, under Rule 104(a), that the scientific evidence 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' W.Va.R.Evid. 702. Appellate review of the trial court's rulings under the relevancy requirement are reviewed under an abuse of discretion standard. *State v. Beard*, 194 W.Va. 740, 746, 461 S.E.2d 486, 492 (1995).

With respect to claims alleging double jeopardy, "[they are] reviewed *de novo*." *See* Syl. Pt. 1, *State v. McGilton*, 229 W.Va. 554, 729 S.E.2d 876 (2012). Keeping these standards of review in mind, we proceed to consider the Petitioner's assignments of error.

### III. ANALYSIS

#### A. *Expert Witness Testimony*

The State was permitted to introduce expert testimony at trial that P.L. was subject to GHB intoxication on the night that she was allegedly sexually assaulted by the Petitioner. The Petitioner alleges that the circuit court erred in allowing the State to present one of its expert witnesses, Trinka Porrata, on the issue of GHB intoxication because the science behind her testimony does not meet the standard enunciated in

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Petitioner asserts that Ms. Porrata is simply a self-proclaimed expert and that her testimony regarding GHB intoxication constituted "junk science."

Prior to trial, the State duly notified the Petitioner's counsel that it intended to call two different expert witnesses, Dr. Adams and Ms. Porrata, on the issue of GHB intoxication. The Petitioner's counsel filed a motion to exclude Ms. Porrata as an expert witness. The circuit court conducted a *Daubert* hearing on November 8, 2013. At the hearing, Dr. Adams, who has a Ph.D. in pharmacology and toxicology, stated that she had supervised the chemical analysis of a June 11, 2012 sample of P.L.'s urine. In a report issued July 20, 2013, the results of that sample showed that there was 9.5 micrograms per milliliter of GHB in P.L.'s urine. Dr. Adams opined that research has shown that living people not exposed to GHB were known to show up to ten micrograms of GHB per milliliter in their urine. She stated that after eight to ten hours, an administered dose of GHB would be undetectable in a sample.

P.L. was examined by a forensic nurse examiner approximately sixteen to twenty hours after the sexual assault allegedly occurred. On cross-examination, Dr. Adams testified that after twenty hours, administered GHB would not be detectable in the urine. She went on to say:

Q. Okay. But if we have the twenty hours before as your standard for your hypothetical question the twenty hour rule would be there would be no GHB from the administering twenty hours before, is this correct?

A. I wouldn't expect it to still be detectable, correct.

Q. Okay. And so that other one would merely be a guess and couldn't be applied to a reasonable degree of scientific certainty could there?

A. It would be a guess.

The State then presented Ms. Porrata, a former Los Angeles police officer, who testified, as discussed in further detail below, regarding her qualifications, experience and familiarity with GHB. Ms. Porrata reviewed the report of Dr. Adams and agreed that Dr. Adams was correct in her assumption that if a dose of GHB had been administered at 2:00 a.m. and the sample was not collected until 10:00 p.m. later that day, no such administered GHB could be detectable in a sample. Because of the absence of other detectable drugs in P.L., and in view of P.L.'s symptoms on the night of the alleged sexual assault, including her out of body sensations and inability to move or speak, pristine memory loss, and profuse vomiting, Ms. Porrata concluded that this was a case wherein the P.L. had been administered GHB.

Following the *Daubert* hearing, the circuit court ruled that Dr. Adams and Ms. Porrata were qualified to render expert opinions on GHB intoxication at trial. Petitioner's counsel objected to the circuit court's ruling.

11

At trial, the State presented the testimony of both Dr. Adams and Ms. Porrata. Petitioner's counsel stipulated to Dr. Adams' status as an expert witness. Dr. Adams testified that the maximum time frame in which to detect an administered dose of GHB was ten hours. On direct questioning, Dr. Adams testified:

> Q. Can you draw any conclusion to a reasonable degree of scientific certainty whether GHB was used during the alleged sexual assault in this case?
>
> A. I cannot.

Over the objection of the Petitioner, the State then moved to admit Dr. Adams' report. The defense also moved to strike the witness's testimony.

Next, Ms. Porrata testified that she believed that P.L. was the victim of a GHB-facilitated sexual assault based on the symptoms described by P.L. Based upon P.L.'s description of her pristine memory loss which precisely coincided with her departure from Doc's bar, her awakening during the sexual assault with a complete inability to speak or move her limbs, her out-of-body sensations, and her violent vomiting, Ms. Porrata's testified that a drug was likely administered to P.L. which caused her to become intoxicated and incapacitated. Ms. Porrata opined that Dr. Adams' report and testimony of the absence of other drugs in P.L.'s body was significant in that it ruled out other drugs that were "[m]ost of the more common ones and were likely ones." Ms. Porrata testified, "Any other drugs that would have given somewhat similar symptoms

12

and would be things to consider would have still been there and they would have tested positive." Thus, using the process of elimination, Ms. Porrata concluded that GHB was the only substance which would have caused P.L's reported symptoms and which would have been absent from P.L.'s body twenty hours later. Ms. Porrata further testified that:

> Q: So were you able to use the absence of those substances to determine what in your opinion was the drug administered to [P.L.] prior to this drug-facilitated sexual assault?
>
> A: Yes.
>
> Q: Which was that?
>
> A: That while it was most consistent with GHB in the first place, even with other things that would have been potential, they were not there at this point and would have been, which reaffirms that it most likely was GHB.
>
> Q: Putting it another way, by process of elimination you are able to determine that it was GHB as well as the consistency with all of the reports that she made of her symptoms?
>
> A: Yes.

The Petitioner renewed his objection to Ms. Porrata testifying as an expert and further objected to her conclusions and her testimony.

On appeal, the Petitioner argues that Ms. Porrata offered no competent peer reviewed articles to support her opinions, and that the only two articles she mentioned in her *curriculum vitae* were ones in the European Journal of Emergency Medicine related to 226 GHB-associated fatalities that she authored. The Petitioner contends that Ms. Porrata is simply a former Los Angeles police officer that observed phenomena that was

13

disturbing to her and thus, she decided to look at this issue during the course of her employment and record anecdotal data. The Petitioner avers that Ms. Porrata then constructed a theory from this anecdotal data and became a self-made expert, and that her testimony is not scientifically reliable. The Petitioner asserts that there was no testing of her conclusion, no testimony concerning her peer reviewed articles, no testimony of the potential role of error and no information on how this theory has been accepted into the scientific community under *Wilt v. Buracker*, 191 W. Va. 35, 443 S.E.2d 196 (1993) and *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469. The Petitioner argues that because this inflammatory testimony was erroneously presented, and that, coupled with the Petitioner's inability to absolutely deny any contact with P.L., he was convicted of second and third degree sexual assault.

"The decision to admit or reject expert evidence is committed to the sound discretion of a trial court, and the court's determinations are reviewable only for an abuse of discretion." *State v. LaRock*, 196 W.Va. at 306, 470 S.E.2d at 625. Rule 702 of the West Virginia Rules of Evidence provides, in pertinent part, that, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." With respect to the admissibility of expert testimony, this Court stated in *San Francisco v. Wendy's Intern., Inc.*, 221 W.Va. 734, 741, 656 S.E.2d 485, 492 (2007):

14

"The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." *Kannankeril v. Terminix International, Inc*., 128 F.3d 802, 806 (3rd Cir. 1997).

"Rule 702 reflects an attempt to liberalize the rules governing the admissibility of expert testimony." *Weisgram v. Marley Co.*, 169 F.3d 514, 523 (8th Cir. 1999). *See also Gentry v. Mangum*, 195 W.Va. at 520, 466 S.E.2d at 179 ("In *Daubert/Wilt*, the *Frye* test was abandoned by the courts, concluding that *Frye's* rigid standard was inconsistent with the *liberal* thrust of the Federal and West Virginia Rules of Evidence." (emphasis in original)); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) (highlighting the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to opinion testimony.'"). "The rule 'is one of admissibility rather than exclusion.'" *In re Flood Litig. Coal River Watershed*, 222 W.Va. 574, 581, 668 S.E.2d 203, 210 (2008) (*quoting Arcoren v. United States*, 929 F.2d 1235, 1239 (8th Cir. 1991)). "Disputes as to the strength of an expert's credentials, mere differences in the methodology, or lack of textual authority for the opinion go to weight and not to the admissibility of their [sic] testimony." *Gentry v. Mangum*, 195 W.Va. at 527, 466 S.E.2d at 186 (citation omitted).

With respect to expert witnesses, "circuit courts must conduct a two-part inquiry under Rule 702 and ask: (1) is the witness [qualified as] an expert; and, if so, (2) is the expert's testimony relevant and reliable?" *San Francisco v. Wendy's Int'l, Inc*., 221

15

W.Va. at 741, 656 S.E.2d at 492 (citations omitted). In syllabus point 5 of *Gentry* we set forth the factors a trial court must analyze to determine if an expert is qualified to render an opinion under Rule 702:

> In determining who is an expert, a circuit court should conduct a two-step inquiry. First, a circuit court must determine whether the proposed expert (a) meets the minimal educational or experiential qualifications (b) in a field that is relevant to the subject under investigation (c) which will assist the trier of fact. Second, a circuit court must determine that the expert's area of expertise covers the particular opinion as to which the expert seeks to testify.

195 W.Va. 512, 466 S.E.2d 171. We have also held that, for purposes of determining whether a person is qualified to testify as an expert,

> [n]either a degree nor a title is essential, and a person with knowledge or skill borne of practical experience may qualify as an expert, although the circuit court may exclude testimony if the experience is too far removed from the subject of the proposed testimony.

*Tracy v. Cottrell ex rel. Cottrell*, 524 S.E.2d 879, 899, 206 W. Va. 363, 383 (1999).

In syllabus point four of *Gentry*, 195 W. Va. 512, 466 S.E.2d 171, this Court held that,

> When scientific evidence is proffered, a circuit court in its "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), cert denied, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects

16

scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand.

In syllabus point six of *Gentry*, 195 W. Va. 512, 466 S.E.2d 171, this Court explained that,

> The question of admissibility under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), cert denied, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994) only arises if it is first established that the testimony deals with "scientific knowledge." "Scientific" implies a grounding in the methods and procedures of science while "knowledge" connotes more than subjective belief or unsupported speculation. In order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. It is the circuit court's responsibility initially to determine whether the expert's proposed testimony amounts to "scientific knowledge" and, in doing so, to analyze not what the experts say, but what basis they have for saying it.

This Court discussed various factors that a circuit court should analyze in assessing the expert testimony's reliability in *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196:

> [i]n analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory

17

and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

Syl. Pt. 2, *Wilt*. However, subsequently, in *San Francisco v. Wendy's Intern., Inc.*, 221 W. Va. 734, 656 S.E.2d 485, this Court cautioned that,

> *[the Wilt] factors are by no means a definitive checklist or test of reliability.* Other courts have developed additional factors, such as whether the scientific theory "was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." *Lauzon v. Senco Products, Inc.*, 270 F.3d 681, 687 (8th Cir. 2001) (citations omitted). Sometimes, a theory first appears in court because of "(a) the inability to publish in a peer review journal because of industry control, (b) the testimony is not novel and therefore of little publication interest, [or] (c) the topic is of little general interest." Larry E. Coben, *Crashworthiness Litigation*, § 24:4 [1998]. A court may treat an expert's qualifications as circumstantial evidence that he or she has used a scientifically valid methodology or mode of reasoning in drawing his or her conclusions. *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C.Cir.1996). In sum, regardless of what other factors a court considers, an expert's opinion is still reliable and admissible if "the expert explains precisely how the conclusions were reached and points to an objective source to show that his or her conclusions are based on a scientific method used by at least a minority of scientists in the field." Coben, *Crashworthiness Litigation*.

(emphasis added).

In discussing the meaning of "reliability," this Court has also stated:

The assessment of whether scientifically-based expert testimony is "reliable," as that term is used in [*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469, and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993)], does not mean an assessment of whether the testimony is persuasive, convincing, or well-founded. Rather, assessing "reliability" is a shorthand term of art for assessing whether the testimony is to a reasonable degree based on the use of knowledge and procedures that have been arrived at using the methods of science—rather than being based on irrational and intuitive feelings, guesses, or speculation. If the former is the case, then the jury may (or may not, in its sole discretion) "rely upon" the testimony.

*In re Flood Litig.*, 222 W.Va. at 582 n. 5, 668 S.E.2d at 211 n. 5. This Court specifically emphasized in *Gentry* that,

[u]nder *Daubert/Wilt*, the circuit court conducts an inquiry into the validity of the underlying science, looking at the soundness of the principles or theories and the reliability of the process or method as applied in the case. *The problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable.*

*Gentry*, 195 W.Va. at 523, 466 S.E.2d at 182 (emphasis in original).

During the *Daubert* hearing in the case sub judice, counsel for the State presented Ms. Porrata's qualifications, including several of her peer reviewed articles listed on her *curriculum vitae* for the court's consideration:

Ms. Porrata has worked in law enforcement for twenty-five years. She worked at the Los Angeles Police Department. She worked in sexual assault and also in narcotics. She's worked as a drug consultant. She's assisted in writing legislation in California and federal legislation about drugs especially drug facilitated sexual assault. She has a bachelor's of police

19

administration and public safety from Michigan State. She also has a number of peer reviewed journal articles that are listed in her curriculum vitae those involving [Dr. Deborah] Zvosec. One is called "Preventable Deaths Associated with Gamma Hydroxybutryrate," another is "Fatal Motor Vehicle Collisions While Gamma Hydroxybutyrate Intoxicated," a third "Preventable Deaths from Gamma Hydroxybutyrate Ingestion, a fourth, "Gamma Hydroxybutyrate Associated Fatalities Overlap of Post-mortem GHB Levels with Endogenous Therapeutic and Non-fatal GHB Toxicity Cases and Factors Supporting Exogenous Origin," all four of these are peer review articles related to GHB.[4]

---

[4] Specifically, Ms. Porrata's curriculum vitae and report provides that she was involved in initiating and writing the proposal for the California legislation for both flunitrazepam (Rohypnol, aka roofies) and GHB and testified before legislative committees regarding those drugs. She was also involved in federal GHB legislation and testified before a Congressional hearing. She was involved with the Los Angeles Sheriff's Department (LASD) and Santa Monica Rape Treatment Center (SMRTC) and other medical professionals in developing joint policies and a single sexual assault kit to be utilized by both LAPD and LASD in response to the growing issue of drug-facilitated sexual assault. The SMRTC is highly regarded in the medical sexual assault field and her early training materials on drug-facilitated sexual assault were utilized in other nationwide training manuals, including publications by the National Drug Intelligence Center of the US Department of Justice and the National Association of District Attorneys on investigation of drug-facilitated sexual assaults.

Ms. Porrata's curriculum vitae and report also reflects that she has been training law enforcement and medical professionals about drug-facilitated sexual assault since 1995. Since retiring from the LAPD, she has worked continuously as a drug consultant, providing training and consultation and expert testimony on the subjects of rave and club drugs, current drug trends, and drug-facilitated sexual assault. She is internationally recognized as an expert on these issues and particularly the drug GHB and has worked with and presented with highly noted rape and GHB experts and toxicologists. She has also presented for the International Association of Forensic Nurses on the topic of GHB addiction, as well as for numerous police and medical conferences on current drug trends and drug-facilitated sexual assault. She co-authored a chapter for the book, "Drug-Facilitated Sexual Assault: A Forensic Handbook," which is considered the authoritative source on how to investigate drug-facilitated sexual assault cases involving GHB and other predatory drugs, victim response and investigative techniques. She has consulted

(continued . . .)

20

Additionally, prior to asking that Ms. Porrata be recognized as an expert in the field of GHB and drug-facilitated sexual assault, counsel for the State also established the following about Ms. Porrata: she is president of Project GHB; she has worked with more than 3,500 GHB addicts in twenty different countries; she has interviewed hundreds of sexual assault victims and hundreds of voluntary users of GHB; and she provides training to medical professionals, police officers and law enforcement regarding GHB-administered doses in use with drug-facilitated sexual assault, which courses range from fifteen-minute roll call classes to sixteen-hour courses on drug-facilitated sexual assault for the Regional Counterdrug Training Academy for eight southern states. In ruling that Ms. Porrata was qualified as an expert witness and that her testimony was relevant and reliable and therefore admissible, the circuit court articulated the following reasons for its decision:

> And so what we have is a report and conclusions reached as to the amount of certain substances in the urine and then an interpretation of that report by the witness Trinka Porrata and Trinka Porrata testified on direct to her expertise that she was twenty-five years as a police officer in Los Angeles, six years

on numerous criminal cases, for both prosecution and defense, and civil cases on various drugs and has testified as an expert as a result of numerous sexual assault and drug investigations and arrests in local, state and federal courts. She is currently an adjunct instructor for St. Petersburg College in Florida, teaching "Current Drug Trends" and "Drug-Facilitated Sexual Assault. She also teaches a drug-facilitated sexual assault class Regional Counterdrug Training Academy in Meridan, Mississippi.

21

in drug enforcement, that she's been heavily involved in movements to make certain drugs which have a reputation for facilitating sexual assault to move them [t]o the category of being illegal and that she had worked with a number of doctors, that she has taught worldwide, that she held seminars both nurses and medical setting and police officer - training officers and that she has written articles that have been peer reviewed and that she is has for many years been active in what I guess she would describe as a phenomena of drug assisted sexual assaults.

She testified to the testing of subjects that was a double blind testing with regard to the effects of these drugs in the system and it appeared to the Court that she had a level of detail and expertise with regard to these substances, that would rather easily exceed that of a lay person in fact she would appear to be one of the foremost experts in this field currently working. So it appears that a proposition as to the effect of these types of substances on a person and how they might be used and the effects that one might expect from them she would appear to be a competent] expert in that area. It would appear that also that the study of them has been that it strikes the Court as being reasonabl[y] scientific and not as we've said at the outset, not junk science, but science with an actual basis and she would appear to be a person who would be qualified to give such opinion as to the effects of such a substance upon a human being and whether or not that would be consistent with an issue in this case where we have an alleged victim in the case who by proffer will testify that her own experiences of that evening are that she was sexually assaulted when she was physically incapacitated due to the administration of a substance which involuntarily left her physically incapacitated and... I think it's relevant evidence that the state would be permitted and would not exclude it.

Upon review of the record before us and the applicable precedent, we conclude that the circuit court did not abuse its discretion in allowing Ms. Porrata to testify as an expert in this field. First, the court addressed whether the scientific theory

22

and its conclusion can be and have been tested. The court found that double blind testing had been performed to support Ms. Porrata's testimony. Moreover, it concluded that the scientific theories espoused by Ms. Porrata were subjected to peer review and publication, as evidenced by the number of peer reviewed articles cited in Ms. Porrata's *curriculum vitae* and listed on the record by the prosecutor. Further, the court recognized that the scientific theory is generally accepted within the scientific community, and is taught to both medical and law enforcement professionals by Ms. Porrata herself, and that Ms. Porrata is one of the foremost authorities on the subject. Accordingly, the circuit court concluded that the testimony was to a reasonable degree based on the use of knowledge and procedures that have been arrived at using the methods of science, rather than being based on irrational and intuitive feelings, guesses, or speculation. *In re Flood Litig.*, 222 W.Va. at 582 n.5, 668 S.E.2d at 211 n.5. Given the liberal thrust of Rule 702 and observing the principles of stare decisis when we consider our legal precedent on this issue, we cannot say that the circuit court committed an abuse of discretion in admitting Ms. Porrata's expert testimony.

### B. Cross-Examination of Billy Carper

In his second assignment of error, the Petitioner contends that the court erred in not allowing him to introduce evidence or question the State's witness, Billy Carper, on what activity if any took place immediately prior to P.L. going into the house where she was allegedly assaulted. Petitioner alleges that during the cross-examination

23

of Billy Carper, it became obvious that P.L. expressed some interest in him. Mr. Carper testified that on their way home from Doc's bar, he was in the front seat and the Petitioner was driving. Mr. Carper stated that P.L. began pulling on Mr. Carper's arm to try to get him into the backseat. Mr. Carper further testified that he was pulled into the backseat with P.L., whereupon defense counsel inquired as to what happened. At that point, the State made a rape shield objection.[5] The circuit court stated that this testimony

---

[5] Our rape shield statute, W. Va. Code § 61-8B-11(b) (1986) provides,

> In any prosecution under this article evidence of specific instances of the victim's sexual conduct with persons other than the defendant, opinion evidence of the victim's sexual conduct and reputation evidence of the victim's sexual conduct shall not be admissible: Provided, That such evidence shall be admissible solely for the purpose of impeaching credibility, if the victim first makes his or her previous sexual conduct an issue in the trial by introducing evidence with respect thereto.

Recently, in Syllabus Point 8 of *State v. Robert Scott R., Jr.*, 233 W.Va. 12, 754 S.E.2d 588 (2014), this court reiterated its holding regarding the standard for evaluating the exclusion of evidence pursuant to the rape shield law codified at West Virginia Code § 61-8B-11 and in West Virginia Rule of Evidence 404(a)(3):

> "The test used to determine whether a trial court's exclusion of proffered evidence under our rape shield law violated a defendant's due process right to a fair trial is (1) whether that testimony was relevant; (2) whether the probative value of the evidence outweighed its prejudicial effect; and (3) whether the State's compelling interests in excluding the evidence outweighed the defendant's right to present relevant evidence supportive of his or her defense. Under this test, we will reverse a trial court's ruling only if there has been a clear

(continued . . .)

24

was not covered by rape shield, but rather was a statement of what happened at a time close to the alleged assault. Specifically, it stated,

> Many of the things at least in my experience that the rape shield law is meant to protect against is the use of things that have to do with a person's reputation or previous actions or things of that nature. But it appears to the Court that what we are hearing so far is things that might be illustrative of the degree of intoxication or mental state going into an evening.
>
> . . .
>
> I think as long as the direction of this inquiry has to do with the state of mind of the victim on the night in question, the actions of the victim on the night in question, that it may be relevant to the activities of the evening. I don't see the rape shield laws being implicated.

---

abuse of discretion." Syllabus Point 6, *State v. Guthrie*, 205 W.Va. 326, 518 S.E.2d 83 (1999).

This Court in *State v. Green*, 163 W.Va. 681, 693, 260 S.E.2d 257, 264 (1979), wrote:

> We would suggest that evidence of consensual sexual activities with others, not specifically and directly related to the act of which a victim complains, should never be admissible; and that such evidence that is specifically, directly related to the act for which a defendant stands charged, must be of a quality that its admission is necessary to prevent manifest injustice and therefor outweigh the State's interest in protecting persons who have been sexually abused from attempts at besmirchment of their character by ones who have trespassed upon their bodies.

25

The State's counsel noted its concerns that the Petitioner's counsel may elicit irrelevant testimony regarding whether P.L. and Mr. Carper were kissing in the back of the truck, and that this evidence of consensual activity with others which is not specifically related to the act of which P.L. complains was protected by the rape shield statute. The Petitioner's counsel reiterated that he believed this information was necessary to set the scene as to what happened that night. He stated that he needed "to have those answers to questions because it explains basically why [P.L.] did what she did, not necessarily to prove her character, because that [was] not the purpose for which [he was] asking this, it is why she did what she did. He argued,

> I think, again, as the Court pointed out at a sidebar, what she did at the bathroom at Doc's would be extrinsic to the act in question, whereas what she did in the truck that caused her to walk into the house and race upstairs is intrinsic to this particular set of facts and basically could maybe explain that or may help the jury understand what happened.
>
> This is not remote in time. This isn't character evidence. This is the gist of this charge against Mr. Wakefield.

The State's counsel countered that,

> [t]he state of mind of [P.L.] has nothing to do with the charges against Mr. Wakefield. . . That is not relevant and it does not go to any of the elements of the offense. What goes to the elements of the offense is what happened in that upstairs bedroom when [P.L.] was sexually assaulted, not what happened in the back seat of a truck on the way to the house.

The Petitioner's counsel went on the argue,

26

[t]his has nothing to do with reputation, has nothing to do with her physical or sexual contact with somebody else, because I believe there is not going to be any indication that there was sexual contact but I don't know.

But even if there were, if she had capacity to give consent, the State has not brought any kind of civil action or criminal action against Mr. Carper, so if she had the capability of giving consent to sexual activity in the truck, which I don't know whether it did or didn't, I don't think there was, then that would be relevant as to whether or not within a certain period of time, and we don't know how long that is because the victim doesn't remember, I think all of that becomes relevant and it becomes critical to our case and would be a manifest injustice to use the rape shield to say that the physical actions of the alleged victim immediately prior to the alleged crime would not be admissible.

After some discussion by the circuit court regarding the function of the rape shield law and its necessity in protecting rape victims from scurrilous character attacks, it ultimately ruled that,

[w]e are moving into a period of time very, very close to the actions complained of. We are dealing with essential issues in the case which are consciousness, awareness, physical capacity, mental capacity.

There is a concept in the law called the rule of completeness which I think would rather suggest that, especially in an instance where the State's case may have a period of time that cannot be spoken to, that to preclude a witness from testifying as to something that happened that may have the capacity of showing and reflecting upon the abilities or awareness and degree of consciousness or whatever else of the victim in this case, that it just seems so relevant and so far from an attempt to besmirch character and so really sort of right at the issues at hand, that I think Mr. Kratovil doesn't put too fine a point on it, that it could work a manifest injustice in the case in not

27

allowing the case to be presented. I am persuaded that would be the case.

Now Mr. Kratovil and Madam Prosecutor, both of you upon making this ruling, Madam Prosecutor I note the State's objection, but, Mr. Kratovil, that is not a license for you to, depending upon what this witness' response may be to some of these questions, to ask inflammatory follow up questions or questions which may attempt to sort of link some kind of comment upon a connection or sort of salacious connection or anything of that nature. I don't think I have to caution you of that, but I am just saying it to let it be known.

You argue, first of all, that you don't know what his response is going to be, and, secondly, what you suspect them to be, within that limited window of your purported expectation and use, I think that you have a right to do it.

I will note the State's objection to that.

Petitioner contends on appeal that as a result of the circuit court's admonishment, a weak record was made about what happened in the backseat. The Petitioner contends that Mr. Carper was then asked what happened when he and P.L. were locked in the truck, but he really did not answer the question. The Petitioner maintains that based upon the court's ruling, he was unable to effectively cross-examine the witness. Petitioner alleges that he would have asked a follow-up question regarding any sexual activity that may have occurred between P.L. and Mr. Carper. The Petitioner contends that it was important to determine what happened in the truck after it was locked because it might explain the bruising identified by the forensic nurse and P.L.'s slight vaginal tearing.

28

We find the Petitioner's argument unconvincing. Our review of the record reveals that the trial court did not preclude the Petitioner from fully cross-examining Mr. Carper on what took place in the truck. Rather, as the above-quoted record demonstrates, the trial court merely cautioned the Petitioner not to ask any inflammatory questions. In other words, it merely limited how the Petitioner was to frame the questions presented to Mr. Carper. Following the circuit court's ruling, the Petitioner's counsel had the opportunity to ask Mr. Carper what happened, if anything, while he was in the back seat with [P.L.]. Mr. Carper testified as follows:

> A.     There was a conversation. There were some –[P.L.] was a very – she is a very happy person, she is very, if I can explain, sometimes I am at the office she will just come by and –
>
> Q. Why don't you focus on what happened that night and just tell the jury what happened that night.
>
> A. Well, I was trying to base a foundation as to why she was –
>
> Q. What was the nature of the conversation?
>
> A. There was really not a lot of conversation. She is a very happy person. She was laughing. She was giggling. Like I said, she has a habit of smacking me on the top of the head, rubbing the top of my head. She does it all the time. I was going to say in the office a lot. So there was some of that going on. But then she was pulling at me. So that it what I was really referring to.
>
> As far as when I got in the back, that way she is not a distraction because, I mean, it is just her nature, the way she is. Then there was a short drive home, so less than a mile, so doesn't take a whole lot of time to get there.

29

Q. So my understanding is you were in the back seat with [P.L.], she was rubbing your head and giggling, and then when you got to your house, Mr. Wakefield backed the truck into the parking spot there?

A. Yes, he backed his truck in.

Q. And he got out of the truck and he walked up to the house and turned and locked the doors?

A. Yes, he walked into the back door. I think when he got out of the truck, he must have hit the door locks.

Q. Okay. And how long was it before you recognized that Mr. Wakefield was gone?

A. It wasn't very long at all. In fact, I knew that he had exited the vehicle and I almost immediately knew that because I heard the doors, the door lock mechanism go down, so I knew we were locked in the truck at that point.

Q. And what did you do, if anything?

A. Well –

Q. While you were locked inside the truck?

A. Well, I remember telling [P.L.], and I was joking, I said, I think he locked us in the truck. Of course, she didn't really respond to it. I knew I had to find a way to get out. I couldn't call him back over. So that is when I reached up to hit the door locks on the side of the door so I could get us – we could get out.

Q. How long did it take you from the time that Mr. Wakefield left the truck to the time that you got out of the house?

A. I would say less than five minutes. It wasn't very long.

Q. Once you got out of the truck and walked up to the house, what happened next?

30

. . . .

To the extent that the Petitioner had specific questions that he believed he could not ask Mr. Carper given the circuit court's ruling, the Petitioner should have made a proffer on the record during trial so that this Court would have opportunity to review the alleged excluded questions on appeal. Based upon the record before us, however, we cannot conclude what specifically the Petitioner alleged he could not ask Mrs. Carper during cross-examination. Accordingly, we find that the Petitioner failed to preserve the issue, in the context in which he currently presents it, for appellate review. Thus, we affirm the circuit court's ruling.

### C. Double Jeopardy

In his third assignment of error, the Petitioner asserts that the circuit court violated double jeopardy principles[6] by allowing the jury to consider both second degree

---

[6] In syllabus point 1 of *State v. Myers*, 171 W.Va. 277, 298 S.E.2d 813 (1982), this Court recognized that:

> "The Double Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, provides immunity from further prosecution where a court having jurisdiction has acquitted the accused. It protects against a second prosecution for the same offense after conviction. It also prohibits multiple punishments for the same offense." Syl. pt. 1 of *Conner v. Griffith*, 160 W.Va. 680, 238 S.E.2d 529 (1977).

sexual assault and third degree sexual assault based on the evidence.[7] Relying upon *State v. Sayre*, 183 W.Va. 376, 395 S.E. 2d 799 (1990) and the United States Supreme Court ruling in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), the circuit court below permitted the jury to deliberate on both second degree and third degree sexual assault on the basis that P.L. was "physically helpless" (second degree sexual assault) and also "mentally incapacitated" (third degree sexual assault) because she was involuntarily intoxicated. In *Sayre*, this Court affirmed the conviction of the defendant for both third degree sexual assault based upon the age difference between

---

[7] Our second degree sexual assault statute, W. Va. Code § 61-8B-4 (1991), provides, in pertinent part,

> (a) A person is guilty of sexual assault in the second degree when:
>
> . . .
>
> (2) Such person engages in sexual intercourse or sexual intrusion with another person who is physically helpless.

Our third degree sexual assault statute, W. Va. Code § 61-8B-5 (2000), provides, in pertinent part,

> (a) A person is guilty of sexual assault in the third degree when:
> (1) The person engages in sexual intercourse or sexual intrusion with another person who is mentally defective or mentally incapacitated; . . . .

Sayre and his victim, and second degree sexual assault based upon forcible physical compulsion. 183 W.Va. at 380, 395 S.E. 2d at 803.[8]

Here, the Petitioner contends that, unlike *Sayre*, the facts of this case reveal that P.L. could not move or talk because of her alleged mental incapacitation, not because of some physical incapacitation. Therefore, the Petitioner asserts that the jury should not have been asked to deliberate on second degree sexual assault.

Pursuant to W. Va. Code § 61-8B-1(4), "mentally incapacitated" is defined as:

> "Mentally incapacitated" means that a person is rendered temporarily incapable of appraising or controlling his or her conduct as a result of the influence of a controlled or intoxicating substance administered to that person without his or her consent or as a result of any other act committed upon that person without his or her consent.

W.Va. Code § 61-8B-1(4). On the other hand, "physically helpless" is defined as:

> "Physically helpless" means that a person is unconscious or for any reason is physically unable to communicate unwillingness to an act.

W. Va. Code § 61-8B-1(5).

---

[8] Our analysis in *Sayre* concerned earlier versions of the applicable statutes.

The Petitioner contends that the definition for "mentally incapacitated," not "physically helpless," more closely resembles the alleged facts in the present case; *i.e.*, P.L. was rendered temporarily incapacitated and was unable to control her conduct, as a result of an alleged act committed by the Petitioner - the administration of GHB. Petitioner argues that the language found in the definition of "mentally incapacitated," *i.e.*, "rendered temporarily incapable . . . as a result of the influence of a controlled or intoxicating substance administered to that person ... or... any other act committed upon that person.," clearly indicates that a victim's temporary incapacitation must have resulted from the willful actions of the perpetrator of the sexual assault or by another party who assisted in facilitating the crime.

Here, the Petitioner argues that the facts relied upon by the State to attempt to prove second degree sexual assault are merely an extension of those relied upon to establish third degree sexual assault. The Petitioner avers that second degree sexual assault is limited to purely physical conditions causing incapacitation and, in that regard, the Legislature was focused upon pre-existing physical conditions, such as whether the victim is in a coma, has had a brain injury, head trauma or a stroke, was born with a brain stem birth defect or that the victim has some form of irreversible paralysis - all more permanent rather than temporary conditions. For that reason, the Petitioner argues that the Legislature set a stiffer sentence for sexual assault in the second degree of from ten to

twenty-five years, while a finding of a victim being "mentally incapacitated" aligns with sexual assault in the third degree, carrying a penalty of from one to five years.

Petitioner is not asserting that charges of both second degree and third degree sexual assault could *never* arise from a single sexual act. Rather, he simply argues that given the particular facts of his case, and in light of legislative intent, the charges of second degree sexual assault which were brought against him were unfounded. He asserts that it was therefore a violation of double jeopardy principles for the State and the circuit court to allow him to be tried, convicted and sentenced on the two counts of second degree sexual assault, while, at the same time, also trying, convicting and sentencing him on the two counts of third degree sexual assault.

Conversely, the State maintains that based upon this Court's decision in *Sayre* and the United States Supreme Court decision in *Blockburger*, the jury was properly instructed to consider both second and third degree sexual assault. The State contends that if the court did, however, err in permitting the jury to deliberate and return a verdict on all four counts of the indictment, such an error was harmless, in that the court later exercised its discretion and sentenced the Petitioner to the same sentence which would have been imposed had he been convicted of only one count of second degree sexual assault.

As an initial matter, while we recognize that the Petitioner's sentences for counts three and four are to be served consecutively to one another (but concurrently with the sentences in counts one and two), the sentences for counts three and four do not merely evaporate simply because of the concurrence of the sentences. The separate convictions, apart from the concurrent sentences, have potential adverse collateral consequences that may not be ignored. *See Ball v. U.S.*, 470 U.S. 856, 105 S.Ct. 1668 (1985). For example, the presence of four convictions, instead of two, on the record may delay the Petitioner's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. *Id*. at 865. Thus, any potential error by the circuit court on this issue must be substantively evaluated.

This Court held in syllabus point four of *Sayre*, 183 W.Va. 376, 395 S.E. 2d 799, that

> "'[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.' Syl. pt. 8, *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983), quoting *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932)." Syllabus point 1, *State v. Peyatt*, 173 W.Va. 317, 315 S.E.2d 574 (1983).

In *State v. Barnes*, 2013 WL 2300946 (May 2013) (memorandum decision), this Court conducted a double jeopardy analysis evaluating the statutory provisions of both second and third degree sexual assault, and concluded that each crime,

36

as specifically pled in that case, required proof of an additional fact that the other did not. We concluded that pursuant to West Virginia Code § 61–8B–4(a)(1), second degree sexual assault required proof of forcible physical compulsion, which was different than what is required to establish third degree sexual assault. *Id*. at *4. Pursuant to West Virginia Code § 61–8B–5(a)(l), third degree sexual assault required proof that a victim was mentally incapacitated, which was different from the proof necessary to establish second degree sexual assault. *Id*.

We do not agree with the Petitioner's analysis of the statutory provisions at issue. In analyzing the statutory provisions of both second and third degree sexual assault, we conclude that each crime, as specifically pled in this case, requires proof of an additional fact that the other does not. Pursuant to W. Va. Code § 61-8B-5(a)(1), second degree sexual assault requires proof that P.L. was "*physically* helpless," (meaning that the victim was "unconscious or *for any reason [was] physically unable to communicate unwillingness to an act*" under W. Va. Code § 61-8B-1(5) (emphasis added)), which is not required to establish third degree sexual assault. Pursuant to West Virginia Code § 61–8B–5(a)(l), third degree sexual assault requires proof that P.L. was "*mentally* incapacitated," (meaning that she was "*rendered temporarily incapable of appraising or controlling [her] conduct as a result of the influence of a controlled or intoxicating substance administered to [her] without [her] consent* or as a result of any other act committed upon [her] without [her] consent" under W. Va. Code § 61-8B-1(4) (emphasis

37

added)), which is not required to establish second degree sexual assault. For these reasons, we conclude that the circuit court's ruling on this issue should be affirmed.

### D. Juror Misconduct

In his final assignment of error, Petitioner contends that the circuit court erred in allowing the bailiff to have a conversation with a juror on February 12, 2014, about a potential witness. The Petitioner alleges that his constitutional rights under the Confrontation clause were violated by a conversation between a juror and the bailiff regarding the juror's passing knowledge of the identity of a person who did not appear as a witness. However, Petitioner concedes that he "did not object at the time".

> The following occurred at trial:
>
> THE COURT: The bailiff informed me that one of the jurors informed him that when the last witness was speaking of people, police officers involved in the chain of investigation, Officer Sell's name came up. This juror on our break immediately after that witness, informed the bailiff that she was aware of an Officer Sell because she works at the Sheetz store and an officer by that name apparently comes in the store from time to time.
>
> She apparently indicated to the bailiff she had no independent sort of acquaintance or relationship with him, but she was aware of an officer by that name who came to the store where she was employed.
>
> I made that known to counsel for both sides. The Prosecutor told me that it wasn't the State's intention to have that officer as a witness.

38

Does anybody want to further make up the record? Feel free both sides.

MR. KRATOVIL: We don't intend to call Sergeant Sell as a witness in our case.

THE COURT: Is that still your intention not to call him?

MS. SIMS: Correct.

THE COURT: He wouldn't be a witness.

MS. SIMS: We don't intend to call him. I can't see how we could call him in rebuttal to be honest.

THE COURT: Is there general agreement that it is really not an issue?

MR. KRATOVIL: I think that it is not an issue.

THE COURT: Okay. All right.


The State maintains that because the Petitioner did not timely object to the alleged Confrontation Clause violation, or move for a mistrial, he waived his ability to raise this issue on appeal. Recently this Court reiterated that the failure to preserve error constitutes a waiver of that alleged error:

> This Court has recognized that "[w]hen there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined." Syl. pt. 8, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). *Accord* Syl. pt. 4, in part, *State v. Lightner*, 205 W.Va. 657, 520 S.E.2d 654 (1999). Similarly, we have stated that "[g]enerally the failure to object constitutes a waiver of the right to raise the matter on appeal." *State v. Asbury*, 187 W.Va. 87, 91, 15 S.E.2d 891, 895 (1992) (per curiam).

39

*Manor Care, Inc. v. Douglas*, 234 W.Va. 57, 68, 763 S.E.2d 73, 84 (2014) (emphasis added).

Petitioner here neither objected, nor moved for a mistrial. Rather, he conceded at trial that the conversation between the juror and bailiff - the same conversation of which he now complains was a violation of the confrontation clause - was not an issue. Based upon the Petitioner's failure to preserve this alleged error, we decline to now consider this matter on appeal.

## IV.  CONCLUSION

Accordingly, for all of the foregoing reasons, we affirm the July 16, 2014 sentencing order entered by the Circuit Court of Jefferson County.

Affirmed.